dure), and its prayer for relief asks for a lien upon the premises, which is in harmony with the theory of the complaint. Under such circumstances, under all the authorities, the plaintiff is entitled to file a notice of pendency of the action, and it does not seem necessary to review the authorities.

It is probably true that the court might, in this case, have accepted a deposit, or an undertaking; but that is a matter resting so largely in the discretion of the court at Special Term that it would require a strong case of abuse of discretion to warrant this court in interfering. The language of the Code of Civil Procedure (section 1671) is that if—

"the court on the hearing of the motion shall decide that adequate relief can be secured to the plaintiff and that the case is one in which the judgment sought to be enforced against the real property mentioned in said notice of pendency of action may be secured by the deposit of the amount claimed or by the giving of an undertaking, the court may make an order directing that the applicant make a deposit," etc.

If the court is not convinced that the deposit of a sum of money, or the giving of an undertaking, will protect all of the rights of the plaintiff, then it is not its duty to accept a deposit, or to provide for an undertaking. The right to the lis pendens belongs to the plaintiff under the circumstances stated by the Code, and it is only when the defendant is able to show to the court that all the ends of justice may be met by a substitution of money or an undertaking that he has any right to a cancellation of the notice of pendency of the action. In this case the amount claimed by the plaintiff could not be determined until the accounting, and there was no certainty as to what might be developed upon the trial. The action was to enforce the contract of the defendant to make use of the property conveyed to it for the purpose of satisfying the creditors of the plaintiff, and, while it may be that an undertaking could have been provided which would have protected the rights of the plaintiff, a lien upon the actual property conveyed is an appropriate remedy, and the learned court at Special Term properly refused to accept a deposit of money or to order an undertaking canceling the lis pendens.

The order appealed from should be affirmed.

Order affirmed, with $10 costs and disbursements. All concur, except THOMAS, J., who dissents.

---

### BEREGSZAZI v. KREISCHER BRICK MFG. CO.

(Supreme Court, Appellate Division, Second Department. October 7, 1910.)

MASTER AND SERVANT (§§ 276, 278*)—EXCAVATING CLAY PITS—NEGLIGENCE —EVIDENCE—SUFFICIENCY.

Evidence, in an action for death of an employé caused by caving of a clay bank, *held* insufficient to show that an improper slope caused the accident, or that the employer was negligent.

[Ed. Note.—For other cases, see Master and Servant, Cent. Dig. §§ 959, 964; Dec. Dig. §§ 276, 278.*]

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

Appeal from Trial Term, Richmond County.

Action by Julia Beregszazi, administratrix, against the Kreischer Brick Manufacturing Company. From a judgment dismissing the complaint, plaintiff appeals. Affirmed.

Argued before HIRSCHBERG, P. J., and WOODWARD, BURR, THOMAS, and RICH, JJ.

Isidor Wels (Frank Moss, on the brief), for appellant.

J. Harry Tiernan (L. W. Widdecombe, on the brief), for respondent.

THOMAS, J. Decedent, defendant's servant, was with others digging clay in a pit, when the interior face of the bank fell and killed him and another. The pit was 12 feet square and 8 feet deep, and had banks on the south and east sides, respectively, distant 3 and 6 feet from the base of the slope, which extended back 18 feet in height to the land of another owner. The defendant's superintendent, who alone gave any understandable statement, testified:

"Q. Just describe how it fell out. * * * A. When I came there it was sort of an oval; the sand seemed to slip right out of the center. It left the top of the bank intact; sort of a saucer shape fell out of the center and slid into the pit. During my time as foreman no bank ever slipped into a pit. There never was an accident like that while I was there."

The complaint was dismissed upon the ground that the cause of the accident was not shown. The bank was composed of sand, gravel, and clay, and red dirt on the top. The clay in places is just below, sometimes above, the surface; but in this instance it was 18 feet below the surface. Heitman describes the process of excavation:

"We strip off all the top dirt off the surface * * * until we get down to the body of the clay, and we slope the surface, the dirt, * * * down to a certain angle that we think is safe. I would say that this bank was sloped at the place where this pit was at an angle of about 35 degrees; something like that. * * * That is the customary slope. * * * This hole in which the accident happened was surrounded by a space of 3 feet level, and then this bank went up from that; about 18 feet up in the air; on an angle of 35 degrees on two sides of the work."

The superintendent denied knowledge of the cause of this slide. The learned trial justice suggests that it might be speculated that one of the men struck the bank with a pick. But by the superintendent's statement there was no pick there. Moreover, sand fell, and the men were digging clay from the bottom. The bank would slip if undermined. The authority for this is the superintendent, who was on the ground about 11 o'clock, before the discovery of the accident at about 2 p. m., inspecting the place and looking for, and not discovering, danger; but he adds:

"There had never been anything dug from the face of that bank. There is nothing to dig from there. I am sure of that."

So that conjecture may be eliminated. There is a competent cause stated by an expert witness, to wit, the too sharp slope of the bank and its insufficient support at the pit. This was one of a line of pits, one, separated from another by a wall of clay 3 or 4 feet wide. The only evidence of water was given by the decedent's son, who, on the day before the accident, saw "some water come out of the hill * * * in

the pit; just a little water." The superintendent testified that it was dry. This work required a sloping bank, and the plaintiff sought, by questions addressed to experts, varied in form and substance, to show that it was insufficient. The objections to the questions were usually sustained, or the answers stricken out. The witnesses did not testify from personal knowledge of the strata of earth, sand, gravel, and clay, each demanding a different slope, and there was criticism of the hypothetical questions, in that there were elements lacking, or assumed without evidence.

The essential question related to the stability of the bank under the conditions shown in the evidence. But Allison, who had been connected with the pits at Haverstraw, stated the practice there, and also that the opening of pits under the conditions shown in the evidence "would weaken the bank and cause it to give way and cave in." This and similar evidence was given on direct examination. On cross-examination and to the court he answered:

"The Court: In that case, would not the whole thing go in—the bank, and the side of the pit, and everything else go in? The Witness: It will naturally; yes. Q. If the weakening was caused by the digging the pit, it would not be the side of the bank that would come out; the whole thing would come out, wouldn't it? A. If it was weakening there, yes, sir; and the other will come right on over the top besides. I have seen it give way and fill a hole, where the side of the hole did not give way at all. To Mr. Tiernan: Q. Now, Mr. Allison, assuming that this bank rested on a clay foundation, a fire clay foundation, if you please, and that the bank consisted of sand and gravel, with a strata of clay with a base 3 feet from the top of the pit and reclining back at angle of about 35 degrees, would you say that such a situation as that would be dangerous to the men working in the pit? A. I would; yes, sir. It would be dangerous because you have weakened your base there by having taken 8 feet by 12 by 12 away from it. To Mr. Tiernan: Q. Assuming, Mr. Allison, that the base or the side of the pit 3 feet from the base of this bank did not give way at the time the bank gave way, can you say in what respect it would be dangerous to have a bank erected in that way? A. Why, a side isn't necessary to give way always. There may be a crack there which is— Q. Now— Mr. Moss: Let him answer. A. (continuing). They may give way. Yes; I have seen them give way different times when the side of the hole didn't cave in at all. Q. But your only reason for saying that the work wouldn't be safe is because you believe such an excavation would weaken the base of the bank, is that true? A. I certainly do. Q. And that, too, beside the fact that the side of the excavation may not have given way at the time the bank did—you don't want to change your opinion? The Court: He has said so two or three times.

"Redirect Examination to Mr. Moss: Q. Counsel asked you in what respect it would be dangerous. Would there be any other respect in which it would be dangerous to have the hole so close to the bank? A. Why, even if it didn't weaken it, if anything should happen above the top, or anything else, at 3 feet distance it would be apt to fall in the hole, and in a hole as small as that he wouldn't have a chance to get away. The gravel and dirt from above would come down and fill that hole and cover him up.

"Recross-Examination to Mr. Tiernan: Q. You are of course, assuming that this pit was 8 feet deep on all sides, aren't you? A. Well, if it wasn't 8 feet, it would be practically that way from what I would naturally suppose. I am practically assuming now that this pit was 8 feet deep on all sides. Of course, you have got to allow for a man digging in there.

"Redirect Examination to Mr. Moss: Q. If there was some variation from the exact figure of 8 feet, would that change your answer as to the depth of the pit? A. Well, it would be all according to the variation. I do not mean to say it is absolutely necessary that the pit should be 8 feet deep in every part of it for my answer to apply."

This evidence presents the plaintiff's position, and the question is whether it shows (1) that an improper slope caused the accident; (2) whether the use of such slope was negligent. The superintendent's testimony is that such a slide had not happened previously during his service, begun in 1906, and it may be questioned whether an established method of excavation productive of safety is not more reliable than the opinion experts, unacquainted with the strata, and uninformed save through hypothetical questions necessarily giving no familiarity with the soil, sand, and clay, their quantity, nature, and relation, as imposed one upon another. Allison stated it would cause the bank to give way. This was a sweeping and universal statement, and unless it declared an inevitable result it did not prove the cause in this particular instance. But that such condition of slope does not even generally produce such result in the locality in question is shown by the history of this yard since 1906, where in continuous excavation the slope had not proved insufficient. Hence, if it be improbable that the witness is mistaken, yet the cause and result given by him are so exceptional in that particular place that in the exercise of ordinary care the defendant was not required to provide a more extended slope or additional safeguard. There are accidents resulting from methods on their face so negligent, or so thoroughly proven such, that absence of former accident is unmerited good fortune; but such culpability should not, in the present case, be predicated upon the mere evidence of experts, one or many, who have made no personal examination, much less analysis, of the elements of the banks, as was done in the Haverstraw Case (Sup.) 118 N. Y. Supp. 337, to which appellant refers, where it also appears, wherein there is a wide dissimilarity from the facts in this case, that previous slides had occurred.

The appellant asserts that the pits should have been enlarged to permit the workmen to escape slides, if they occur. There was not occasion to make provision for avoiding slides not expectable, and in any case it would be a conjecture of no legal value that it would so come that in matter of time, place, or forewarning the men could avoid it, however unconfined the limits of the pit.

The contention that the defendant was negligent in its omission to have an overseer continuously present to guard against such accident falls, in view of the stated conclusion.

The judgment should be affirmed, with costs. All concur.